Johnny M. VINCENT, Jr., et al.,  
**Plaintiffs-Appellants,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, a voluntary unincorporated association, et al., Defendants-Appellees.**

No. 78–2411.

United States Court of Appeals,  
Fifth Circuit.

July 23, 1980.

Johnston & Shores, James L. Shores, Jr., Dominick, Fletcher, Yeilding, Dominick & Acker, William M. Acker, Birmingham, Ala., for plaintiffs-appellants.

Cooper, Mitch & Crawford, Jerome A. Cooper, Birmingham, Ala., for Internat'l Brotherhood of Elec. Workers & J. B. Pate.

Corretti, Newsom & Rogers, N. Daniel Rogers, Samuel Maples, Birmingham, Ala., for Local Union # 136.

Before MORGAN, ANDERSON and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This lawsuit was instituted by Johnny Vincent and certain other members of Local 136 (the Local) of the International Brotherhood of Electrical Workers (the IBEW or the International) against the IBEW; Local 136; J. B. Pate, a vice president of the International with supervisory authority over Local 136; and J. F. Wilson, business agent of Local 136. Plaintiffs-Appellants (Vincent) alleged violations of sections 411 and 501 of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 411, 501. Section 411 is designed to insure that unions function democratically by protecting the right of every member to an equal voice in nominations, elections, referenda, and meetings conducted by the union.[1] Section 511 imposes a fiduciary duty on the officers and other representatives of a labor organization.[2] The controversy underlying these allegations concerns the desire of the membership of Local 136 to have a pension plan provision incorporated in its collective bargaining agreement with the Birming-

---

1. 29 U.S.C. § 411 provides, in pertinent part:

(a)(1) *Equal rights.*—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

2. 29 U.S.C. § 501 provides, in pertinent part:

(a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organ-

ization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any manner connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

ham chapter of the National Electrical Contractors Association (NECA).

In 1974 the president of the Local appointed a pension committee, chaired by Mr. Vincent, to formulate a proposal for a pension plan to be used in negotiations with NECA. The contract between the Local and NECA was due to expire on May 31, 1975, and before that date both sides indicated that they desired to bargain for amendments to that agreement. The committee chaired by Mr. Vincent recommended a pension plan offered by Lincoln National Life Assurance Company (the Vincent Plan). The Vincent Plan was submitted to the members of the Local and approved by them at a special meeting held on May 24, 1975. The Local's bylaws, however, permitted special meetings to be called only by the Business Manager or the Executive Board of the Local, which was not done in this case. Accordingly, Pate, a vice president of the International responsible for Local 136, advised the Local that the meeting was illegal and out of order.

Nevertheless, Pate submitted the Vincent Plan to the International President on June 12, 1975, for analysis. The IBEW constitution required a local union to obtain the approval of the International President for any agreement between a local and an employer. Then, at a regular meeting of the Local on June 14, 1975, the membership again voted to support the Vincent Plan, this time with the proviso "so long as it is acceptable by the [International]." On June 16, 1975, the International President wrote to Pate detailing objections to the Vincent Plan and directing Pate to instruct the Local "not to proceed further with the implementation of [the Vincent Plan]." One of the objections to the Vincent Plan appears to have been that it called for the trust to be funded by employer contributions, but administered solely by the Union, which the International believed would be illegal. Another objection to the Vincent Plan was that it made the Union potentially liable for shortages in the fund, a provision that was not acceptable to the International. Although the district court found that the Vincent Plan was altered to overcome

the former objection, it appears that the latter defect was never cured. In his letter to Pate, the International President added that if the Local still wished to establish a pension plan, "they should establish a jointly administered trust through their collective bargaining process." On June 20, 1975, Pate communicated this information to the Local.

Meanwhile, the Local and NECA had commenced negotiations on proposed changes to the collective bargaining agreement. These contract negotiations, however, reached a stalemate. The Local voted twice to reject proposed amendments to the contract that contained no provision for a pension plan, and it appears that NECA was opposed to any contract that did contain a provision for a pension plan. The stalemated negotiations, including the issue of a pension plan, were referred for binding arbitration to the Counsil on Industrial Relations (CIR), an arbitral body composed of equal numbers of representatives from NECA and from the IBEW. At an initial CIR arbitration, on May 22, 1975, the pension plan matter was sent back for further negotiations between the Local and NECA. It was between this arbitration and a second one, conducted on August 13, 1975, that the correspondence between Pate, the International President, and the Local, referred to above, occurred. There was no reference to any particular pension plan at the first arbitration, but at the second arbitration Wilson, the Local's business agent and head of the team representing the Local before the CIR, requested inclusion in a pre-existing pension plan, called the Chattanooga plan. Before the second arbitration, Wilson was told by an International representative that the CIR had not approved any new pension plans in recent months, and that in the representative's judgment a request for inclusion in a pre-existing plan, such as the Chattanooga plan, would fare better. Wilson made no request for establishment of the Vincent Plan, which had never been approved by the International. The CIR granted the request for inclusion in the Chattanooga plan.

■ Vincent contends that the actions of the defendants violated sections 411 and 501 of the Labor-Management Reporting and Disclosure Act. The gist of the § 411 claim is that the Local voted to support the Vincent Plan, yet the defendants in various ways sought to frustrate that expression of the Local's wishes. With regard to the § 411 claim, the district court held that "there was no unequal treatment with respect to a right to vote and the fact that the vote was not translated into action consistent therewith does not in and of itself give a cause of action to the plaintiffs against the International, and Local Union." We agree that there was no abridgement of the equal rights and privileges guaranteed by § 411.

■ Vincent's other claim is that Wilson and Pate breached a fiduciary obligation owed, under 29 U.S.C. § 501, to the Local membership. The gravamen of the complaint on this issue is that Pate ought to have done more to support the Vincent Plan, and that Wilson ought to have requested approval of the Vincent Plan by the CIR, even though the Vincent Plan had not been approved by the International, and ought not to have requested inclusion in the Chattanooga plan.

Vincent contends that § 501 imposes fiduciary obligations on representatives of labor organizations in all their dealings with those organizations. The circuits are split on the question whether § 501 imposes such a broad fiduciary duty on Union representatives, or only imposes that duty with regard to the handling of Union funds and property. *Compare e. g., Pignotti v. Local # 3 Sheet Metal Workers' Int'l Ass'n*, 477 F.2d 825, 832–35 (8th Cir.), *cert. denied*, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973); *Sabolsky v. Budzanoski*, 457 F.2d 1245 (3rd Cir.), *cert. denied*, 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96 (1972); *Cefalo v. Moffett*, 449 F.2d 1193, 1198 n. 15 (D.C.Cir.1971) (broad construction); *with McNamara v. Johnston*, 522 F.2d 1157, 1163 (7th Cir. 1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); *Head v. BRAC*, 512 F.2d 398, 400–01 (2d Cir. 1975) (narrow construction). This court has not passed on the question.

The district court held that § 501 should be construed narrowly, as imposing a fiduciary duty on Union representatives only with regard to the handling of Union funds or property. The court went on to note, however, that even under a broad reading of § 501, like that adopted in the Eighth, Third, and D.C. Circuits, Vincent failed to prove the Wilson or Pate violated § 501. We intimate no view on whether § 501 should be construed broadly or narrowly. Rather, we affirm the judgment of the district court on the ground that, even under a broad reading of § 501, Pate and Wilson did not violate that section.

The membership of Local 136 clearly wanted a pension plan. Moreover, their preference was for the Vincent Plan. Even though Pate declared illegal the special meeting held on May 24, 1975, at which the membership voted to approve the Vincent Plan proposal, Pate nevertheless submitted the plan for analysis by the International President on June 12. Shortly thereafter, on June 14, the Local voted to support the Vincent Plan *so long as it was acceptable to the International.* The plan was not acceptable, as the June 16 letter from the International President to Pate indicated. The Local did not generate any plan acceptable to the International before the second CIR arbitration on August 13. Nevertheless, the matter of a pension plan to be included in the collective bargaining agreement between the Local and NECA was on the agenda for that arbitration. Neither Pate's discouragement of the Vincent Plan to the Local, which was at the direction of the International President, nor Wilson's request to the CIR for inclusion in the Chattanooga plan, which was based in part on advice from an International representative, amounted to a violation of § 501, even when read broadly. At worst, the decision to go with the Chattanooga plan was an attempt to forge a compromise among all interested parties: the Local, the Interna-

tional, and NECA.[3] That attempt at compromise, which resulted in the inclusion of a pension plan in the collective bargaining agreement, did not amount to a breach of trust or of the duty of loyalty owed the Local by Pate and Wilson.

Accordingly, the decision of the district court is affirmed.

AFFIRMED.

---

3. The International was interested in the CIR arbitration because of a provision in the IBEW constitution, Art. XVII, § 7, requiring the International's prior approval of all agreements, including construction trades agreements, to which a local is a party.